UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| CARPENTERS HEALTH AND SECURITY TRUST OF WESTERN WASHINTON, *et al.*, | ) ) ) ) | CASE NO. C12-1252RSM |
| | ) ) | ORDER ON CROSS-MOTIONS FOR |
| Plaintiffs, | ) ) | SUMMARY JUDGMENT |
| v. | ) ) | |
| PARAMOUNT SCAFFOLD, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## I.    INTRODUCTION

This matter comes before the Court on the parties' Cross-Motions for Summary Judgment. Dkts. #107 and #111. Defendants seek summary judgment on two bases: 1) that Plaintiffs' failure to object to the bankruptcy sale of Paramount Scaffold's assets estops Plaintiffs from bringing claims against Defendant California Scaffolding now; and 2) that California Scaffolding is not a continuation or alter ego of Paramount Scaffold.  Dkt. #107. Plaintiffs oppose the motion and cross-move for summary judgment, arguing that neither the bankruptcy sale nor their failure to object to the sale precludes their claims, and that California Scaffold is merely the continuation of Paramount Scaffold and is therefore liable for their

ORDER
PAGE - 1

claims.  Dkt. #111.  For the reasons set forth below, this Court agrees with Plaintiffs, GRANTS their motion for summary judgment and denies Defendants' motion for summary judgment.

## II.      BACKGROUND

This Employee Retirement Income Security Act ("ERISA") (29 U.S.C.S. § 1001 *et seq.*) matter arises from Defendants' alleged failure to pay certain funds withheld from paychecks into required trust funds.  Dkt. #64 at ¶ ¶ 4.1-4.12.  Defendant Paramount Scaffold Inc. ("Paramount") is a now defunct entity, it having filed for Chapter 11 bankruptcy and sold all assets to Defendant California Access Scaffold, Inc. ("California Access").  *Id.* at ¶ 3.27 and Dkt. #75 at ¶ 3.18.  Plaintiffs previously named two individual Defendants, who have since been dismissed for lack of personal jurisdiction.  Dkt. #88.  With respect to the former individual Defendants, Plaintiffs alleged that while acting in their official capacities at Paramount, they withdrew funds from employee paychecks that were to be paid to the Plaintiff Trust Funds on a monthly basis, but did not tender those funds to the Trusts, and instead used and converted the funds for other purposes.  Dkt. #64 at ¶ 3.32.

Paramount filed for Chapter 11 bankruptcy protection on December 16, 2011.  Dkt. #108, Ex. 6.  Paramount's principal office was 16525 S. Avalon Boulevard, Carson, Los Angeles County, California 90746.  Dkt. #108, Ex. 1 at 6-7.  Daniel Johnson was the President, CEO and a Director of Paramount.  He and his wife Kathryn Johnson owned 92.63% of the company's common shares, 83.63% and 9.00%, respectively.   Daniel Johnson and two family partnerships owned 66.62% of Paramount's Class A, non-convertible stock.  Dkt. #108, Ex. 1 at 14.  Mr. Johnson's brother, James Johnson, owned 7.26% of Paramount's common shares.  Dkt. #108, Ex. 1 at 13.  James Johnson was a Vice President and Director of Paramount.  James McCormick was CFO, and Eric Raymond was a Vice President.  Dkt. #108, Ex. 1 at 161.

ORDER
PAGE - 2

California Access was formed in or about March 2012 as a California limited liability company.  Dkt. #109 at ¶ 2 and Ex. 1.  Daniel Johnson is now the CEO of California Access.  James Johnson is a Vice President and Director of California Access and an Executive Salesman.  Dkt. #113, Ex. 15.  Kevin Johnson was a Sales Associate and Project Manager at Paramount and is a family member of Daniel Johnson.  Kevin Johnson holds the same positions with California Access.  *Id.*  Natalia "Natasha" Johnson was an Account Manager at Paramount and is a family member of Daniel Johnson.   Ms. Johnson holds the same position with California Access.  *Id.*  Jason Lee was a payroll supervisor at Paramount and is a payroll manager at California Access.  *Id.*  Other employees that hold the same positions at California Access as they did at Paramount also include Aldo Lopez, Brad Giacoletto and Cynthia Bogarin. *Id.*

Defendants highlight the differences between the two companies as follows:  Paramount was a unionized company; had more than 400 employees; owned 50-60 vehicles; held locations in Washington, Nevada, Louisiana, as well as Northern and Southern California; owned more than $25 million worth of scaffolding equipment; had approximately 4,044 customers; engaged in union and maritime forming, or shipyard scaffolding jobs; and had an annual revenue of about $22 million to $44 million in the five years prior to its bankruptcy.  Dkt. #110 at ¶ ¶ 4-7, 9, 11, 14, 17 and 24.  Paramount was a C corporation, controlled by two large private equity firms (OPE Paramount LLC and Stone Canyon Venture Partners) which owned 99.08% of the Class B controlling shares of Paramount.  Dkt. #110 at ¶ ¶ 10, 20 and 21.

California Access has always been a non-union company, and leases only about 70 individuals from a Professional Employer Organization (PEO) named Oasis Outsourcing.  Dkt. #109 at ¶ 10.  California Access owns 25 vehicles; has a single location in Southern California;

ORDER
PAGE - 3

does not perform any work in Nevada, Washington, Louisiana, or any other state outside California; owns about $7 to $8 million worth of scaffolding equipment; has approximately 1,500 customers – of which 594 have been Paramount's customers in the past; does not engage in any union and maritime forming, or shipyard scaffolding jobs; and has had an annual revenue of about $7 million for the past three fiscal years.  Dkts. #109 at ¶ ¶ 5, 10, 11, 14, 15, 16, 18, 19, 20 and 21 and #110 at ¶ ¶ 9, 11, 14, 17 and 24.  California Access was formed as an LLC by twelve individual member investors who contributed 100 percent of the new cash equity necessary to (1) acquire the assets in the Paramount asset sale, and (2) capitalize California Access from the beginning of its scaffold operations in March 2012.  Dkt. #109 at ¶ 25.  Daniel Styles and Dan Johnson co-manage the day-to-day operations of California Access. Dkt. #109 at ¶ 23.   Daniel Styles, who held no interest in connection with Paramount, is California Access's second largest shareholder and has blocking rights in connection with any material decisions concerning the company.  *Id.* at ¶ 24 and Dkt. #110 at ¶ 29.

The parties do not appear to dispute the foregoing facts.  Rather, they dispute how those facts meet the elements of their legal arguments.  Accordingly, the parties agree that this matter is appropriately resolved on summary judgment.

### III.    DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).    In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d

ORDER
PAGE - 4

547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party.  *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994).  However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 251.

**B.  Defendants' Motion to Strike**

As an initial matter, the Court addresses Defendants' motion to strike Exhibit 16 to the Declaration of Jeffrey Maxwell in support of Plaintiffs' cross-motion for summary judgment. Dkt. #114 at 11-12.  That exhibit is a video, at some point shown on YouTube, which appears to have been produced for a local Fox news network, entitled "Saving the California Dream." Dkt. #113, Ex. 16.  The video segment is one of a multi-part series examining local California businesses and highlights California Access.  *Id.*  Defendants argue that the video is irrelevant and therefore inadmissible under Federal Rule of Evidence 401.  Dkt. #114 at 11-12. Defendants also argue that the video is more prejudicial than probative and therefore inadmissible under Federal Rule of Evidence 403.  *Id.*  The Court disagrees.

The video is relevant to the question of whether California Access is a successor of Paramount as further discussed below.  The Court also rejects Defendants' argument that the video was offered to interject an inflammatory issue regarding the union.  The Court has

ORDER
PAGE - 5

viewed the video and does not find it inflammatory.  In fact, there is every effort by both the reporters and those being interviewed (Mr. Daniel Johnson, Mr. Styles and their local bank/lender) to explain that California Access is not anti-union.  Moreover, the Court is able to view the video impartially and without bias in the context of its analysis below.  Accordingly, the Court DENIES Defendants' motion to strike.

### C.  Effect of Bankruptcy and Successor Corporations

The Court now turns to the parties' substantive arguments.  Defendants first argue that Plaintiffs' claims should be dismissed because Plainitffs are equitably estopped by their failure to object during Paramount's bankruptcy proceedings.  Dkt. #107.  Defendants argue that Plaintiffs had notice of the bankruptcy sale but failed to object to such sale.  On March 28, 2012, the bankruptcy court entered an order approving the sale of Paramount's assets to California Access "free and clear of any interest in such property."  Dkt. #108, Ex. 6.  Defendants argue that they relied on the fact that Plaintiffs did not object to the sale to their detriment.  Dkt. #107 at 10-13.  Defendants also argue that allowing Plaintiffs' claims to stand would have the effect of discouraging potential purchasers in bankruptcy sales, and would now prejudice Defendants who relied on the Plaintiffs' implicit approval of the sale.  *Id.*

Plaintiffs respond that the order approving the bankruptcy sale is inapplicable because Plaintiffs have no interest in the assets that were sold.  Dkt. #111 at 15-16.  Plaintiffs note that their claims against Paramount are based on ERISA, for delinquent fringe benefit contributions, and those claims do not give them the right to lien, claim or encumber any of the assets covered by the bankruptcy order.  *Id.*  Further, Plaintiffs note that they are not one of the entities listed in the order, and are therefore not covered by it.  *Id.* at 16.  In addition, Plaintiffs assert that their claims against California Access arose post-bankruptcy after it became apparent that

ORDER
PAGE - 6

California Access was operating as a successor corporation to Paramount.  *Id.* at 18.  For the reasons discussed below, the Court agrees with Plaintiffs.

The successorship doctrine provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities.  *See Resilient Floor Covering Pension Trust Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2015).  Most states have adopted exceptions to the general no-liability rule that allow creditors to pursue the successor if the "sale" is merely a merger or some other type of corporate reorganization that leaves real ownership unchanged.  Successor liability under federal common law is broader still: in order to protect federal rights or effectuate federal policies, this theory allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale.  *Id.* at 1090-91.  Successor liability is an equitable doctrine, not an inflexible command, and "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."  *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.,* 417 U.S. 249, 256, 41 L. Ed. 2d 46, 94 S. Ct. 2236; see also *Steinbach v. Hubbard,* 51 F.3d 843, 846 (9th Cir. 1995).

In order to determine whether the doctrine applies, the Court must analyze whether California Access is a successor corporation to Paramount.  "The primary question in [labor and employment] successorship cases is whether, under the totality of the circumstances, there is 'substantial continuity' between the old and new enterprise."  *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294 (9th Cir. 1987); *see also New England*

ORDER
PAGE - 7

*Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339, 1342 (9th Cir. 1990); *Steinbach*, 51 F.3d at 846.  To address whether the new business is the successor of an old business, the Court considers the following factors, which are "not . . . exhaustive":

> [Whether] there has been a substantial continuity of the same business operations[;] [whether] the new employer uses the same plant; [whether] the same or substantially the same work force is employed; [whether] the same jobs exist under the same working conditions; [whether] the same supervisors are employed; [whether] the same machinery, equipment, and methods of production are used; and [whether] the same product is manufactured or the same service [is] offered.

*Jeffries Lithograph*, 752 F.2d at 463 (quoting *Premium Foods, Inc.*, 260 N.L.R.B. 708, 714 (1982), *enforced* 709 F.2d 623 (9th Cir. 1983)) (last alteration in original); *see also Haw. Carpenters*, 823 F.2d at 294.  Other cases have considered whether the body of customers is the same. *See, e.g., Fall River Dyeing*, 482 U.S. at 43; *Resilient Floor Covering Pension Trust Fund*, 801 F. 3d at 1090-91.

As the Ninth Circuit Court of Appeals has explained:

> "There is, and can be, no single definition of 'successor' which is applicable in every legal context.  A new employer . . . may be a successor for some purposes and not for others."  *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 262 n. 9, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974).  "[D]ecisions on successorship must balance, *inter alia*, the national policies underlying the statute at issue and the interests of the affected parties," *Sullivan*, 623 F.3d at 782 (quoting *Steinbach*, 51 F.3d at 846) (alteration in original).  "Because the origins of successor liability are equitable, fairness is a prime consideration in its application."  *Id.* (Quoting *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1094 (9th Cir. 1989)).  Thus, these decisions

> > require[] analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc.

ORDER
PAGE - 8

> *Id.* (quoting *Howard Johnson*, 417 U.S. at 262 n.9).   The individual
> successorship factors outlined in *Jeffries* are, accordingly, given greater or
> lesser weight depending on the statutory context.
>
> Moreover, "in light of . . . the myriad factual circumstances and legal
> contexts in which [the employment law successorship issue] can arise, and
> the absence of congressional guidance as to its resolution, emphasis on the
> facts of each case as it arises is especially appropriate." *Howard Johnson*,
> 417 U.S. at 256.  Finally, as the successorship test is "more functional than
> formal," "the absence of one . . . factor" does not compel a particular
> conclusion. *Hawaii Carpenters*, 823 F.2d at 293, 294.
>
> Depending on the statutory context and the type of claim, certain factors
> may warrant greater or lesser emphasis.

*Resilient Floor Covering Pension Trust Fund*, 801 F.3d at 1091.

In the instant matter, looking at the totality of the circumstances, the Court agrees with Plaintiffs that California Access is a successor to Paramount.  Of primary significance is that the management of California Access remains largely the same as it was at Paramount.  Indeed, as noted above, Daniel Johnson is now the CEO of California Access Scaffold.  James Johnson is a Vice President and Director of California Access Scaffold and an Executive Salesman. Dkt. #113, Ex. 15.  Kevin Johnson was a Sales Associate and Project Manager at Paramount. Kevin Johnson holds the same positions with California Access Scaffold. *Id.*  Natalia "Natasha" Johnson was an Account Manager at Paramount and holds the same position with California Access Scaffold. *Id.*  Jason Lee was a payroll supervisor at Paramount and is a payroll manager at California Access. *Id.*  Other employees that hold the same positions at California Access as they did at Paramount also include Aldo Lopez, Brad Giacoletto and Cynthia Bogarin. *Id.*

In addition, California Access Scaffold now uses Paramount's Carson, California property as its corporate office, Dkt. #113, Ex. 14, and there appears to be significant cross-over in the services formerly offered by Paramount and now offered by California Access. *See*

ORDER
PAGE - 9

Dkt. #113, Exs. 9 and 14.  Further, corporate managers have made public statements supporting the contention that the bankruptcy and formation of California Scaffold was a designed corporate restructuring in order to create a nonunion company because potential investors found the union component of Paramount unattractive.  *See* Dkt. #113, Ex. 16.  Despite the differences in revenue and asset holdings, in this context, the Court finds that California Access is a successor to Paramount.

Although the Ninth Circuit Court of Appeals has not addressed this question directly, recent case law supports the Court's conclusion.  In *Resilient Floor Covering Pension Trust Fund*, *supra*, the Court of Appeals examined whether a successor employer, both generally and in the construction industry in particular, can be subject to withdrawal liability under the Multiemployer Pension Plan Amendments Act ("MPPAA").   The Court analyzed the successorship doctrine, recognizing that:

> The successorship doctrine extends to legal obligations arising under the National Labor Relations Act ("NLRA"), the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Family and Medical Leave Act ("FMLA"), among others. *See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987) (NLRA); *Steinbach v. Hubbard*, 51 F.3d 843 (9th Cir. 1995) (FLSA); *Bates v. Pac. Maritime Ass'n*, 744 F.2d 705 (9th Cir. 1984) (Title VII); *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 780-81 (9th Cir. 2010) (recognizing regulations that incorporate common law successorship principles in defining successors-in-interest for purposes of FMLA liability).

*Resilient Floor Covering Pension Trust Fund*, 801 F.3d at 1090.  The Court then emphasized that "[t]he successorship standards are flexible and must be tailored to the circumstances at hand."  *Id.* at 1093.  The circumstance of this case make clear to the Court this both Paramount and California Access were and are business entities held by the same family, and that California Access was simply restructured to address outstanding debt and move forward under

ORDER
PAGE - 10

a model more attractive to investors with less risk related to union-related costs. *See* Dkt. #113, Ex. 16.

The Court also finds persuasive a Seventh Circuit case, *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir. 1995). In *Tasemkin*, the Seventh Circuit Court of Appeals addressed nearly the identical question as the instant matter. The Court first recognized the successor relationship between the two business entities at issue in that case, highlighting the family ownership and involvement between the two:

> This Circuit held just a few years ago that successor liability could lie in a case much like this one, where the predecessor had racked up unpaid pension fund contributions under ERISA. *See Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1327 (7th Cir. 1990); *see also Central States Pension Fund v. Hayes,* 789 F. Supp. 1430, 1435-1436 (N.D. Ill. 1992) (relying on *Artistic Furniture* analysis in holding successor liable for predecessor's delinquent withdrawal liability under ERISA). Why, then, did the Fund lose this case on New Tasemkin's motion to dismiss? Certainly not because of the facts of the transfer: if, as we must at this point in the litigation, we accept the Fund's version of them, these facts suggest both notice and continuity. New Tasemkin was owned by the daughter-in-law of Old Tasemkin's owner, Irving Steinberg; Steinberg's son Leslie, formerly the registered agent for Old Tasemkin, was New Tasemkin's president and secretary; New Tasemkin operated the same business (albeit from fewer locations), employed largely the same staff, and relied primarily on the same suppliers. Leslie Steinberg's active role in both old and new companies may well satisfy the notice prong; New Tasemkin's assumption of Old Tasemkin's corporate identity makes a strong case for substantial continuity. *See G-K-G*, 39 F.3d at 748 (substantial continuity is "satisfied if no major changes are made in [the] operation"); *Steinbach*, 51 F.3d at 846 (continuity found to exist where successor firm kept same employees, operated out of same office, and provided same services).

*Taemkin*, 59 F.3d at 49-50.

The court then discussed the District Court's reasons for rejecting the successorship doctrine, ultimately concluding that:

ORDER
PAGE - 11

once a bankruptcy proceeding is completed and its books closed, the bankruptcy has ceased to exist and the priorities by which its creditors have been ordered lose their force. In the instant case, whatever happens to New Tasemkin in the Fund's pursuit of this claim will have no effect on the bankruptcy proceeding--that is over and done with and the debtor, Old Tasemkin, has ceased to be. The Fund's suit, a full two years after the bankruptcy case has closed, "cannot possibly affect the amount of property available for distribution to [Old Tasemkin's] creditors; all of [Old Tasemkin's] property has already been distributed."

What the imposition of successor liability would accomplish, and what the district court objected to, would be a second opportunity for a creditor to recover on liabilities after coming away from the bankruptcy proceeding empty handed. But a second chance is precisely the point of successor liability, and it is not clear why an intervening bankruptcy proceeding, in particular, should have a *per se* preclusive effect on the creditor's chances.

In so holding we do not suggest that a creditor's prior opportunity to satisfy the claim against the predecessor is irrelevant. In fact, this Circuit and others have held that a creditor's ability to recover against the predecessor is a factor of significant weight in deciding whether to allow successor liability. Instead of being dispositive, however, the availability of relief from the predecessor is a factor to be considered along with other facts in a particular case. Here, those facts include the apparent nature of the acquisition of Old Tasemkin by New Tasemkin--which clearly had the effect, intended or no, of frustrating unsecured creditors while resurrecting virtually the identical enterprise.

*Tasemkin*, 59 F.3d at 51.

The Court finds the same reasoning applicable to the instant matter. Having determined that California Access is a successor to Paramount and having seen no objection by California Access that it had pre-sale knowledge of Plaintiffs' ERISA claims, the Court finds it appropriate to enter Judgment in favor of Plaintiffs on their successor liability/ERISA claims..

## IV.    CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby ORDERS that:

1)  Defendants' Motion for Summary Judgment (Dkt. #107) is DENIED.

ORDER
PAGE - 12

2)  Plaintiffs' Cross-Motion for Summary Judgment (Dkts. #111, #118) is GRANTED.

3)  In their Cross-Motion, Plaintiffs ask for "partial" entry of summary judgment on their successor liability claim.  Dkt. #111 at 23.  However, they have not identified what, if any, claims or issues remain for trial.  Accordingly, the parties shall file a Joint Status Report within ten (10) days of the date of this Order informing the Court: 1) of any issues that remain to be resolved in this matter; 2) if any issues remain for trial how long that trial is expected to be, or 3) whether the Court may enter a complete Judgment and close this case.

DATED this 1 day of February 2016.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 13